## NATURE OF THE DEFENSE SET UP BY AN ANSWER.

Common Pleas Court of Hamilton County.

CHARLES SCHMALSTIG v. CHARLES P. TAFT.

Decided, April, 1917.

*Verdict—When it Should be Set Aside by the Trial Judge—Pleading—
Statement of Agency and an Accounting Not an Affirmative De-
fense—Burden of Proof With Reference to Such Agency.*

1. As a general rule the trial court should not set aside a verdict of
   the jury where the evidence is conflicting and where different minds
   could come to different conclusions, but where the jury disregard
   the law as given them by the court and reach conclusions not
   supported by the undisputed facts of the case, a court should not
   hesitate to set aside a verdict.
2. In an action for money had and received, an answer setting up
   the defense of agency and showing an accounting does not plead an
   affirmative defense. Such an answer merely sets out a statement of
   the case different from the one plaintiff claims to be the true
   transaction, and it is error to charge that the burden of proof is
   upon the defendant to show such agency.

*Worthington, Strong & Stettinius* and *Robert A. Taft,* for
the motion.

*Jacob Shroder,* contra.

MAY, J.

Opinion granting motion for new trial.

The plaintiff sued the defendant for $55,555.55, money had
and received by the defendant for plaintiff's use and benefit.
Nine jurors returned a verdict for him in the sum of $58,703.
The defendant filed a motion for a new trial on the ground that
the verdict is against the weight of the evidence and for error
in giving certain special charges asked for by the plaintiff. The
facts, as proved at the trial, were substantially as follows:

In 1905 the defendant purchased one thousand shares of the
Chicago Base Ball Club at $105 per share; the plaintiff bought
of the defendant one hundred shares at the same price and gave
his note for the same, which note was paid within a year. Be-
1905 and 1914, the club earned an average annual dividend of

115% or 920% during that period. The plaintiff was the confidential employee of the defendant and had been in his employ and that of his father-in-law, the late David Sinton, for twenty-three years. The defendant had purchased the one thousand shares as agent for his wife, Anna S. Taft. Shortly after the purchase, the defendant also sold to one Murphy, 530 shares of the capital stock, to Captain Chance 100 shares, to Mary Walsh, his secretary, 20 shares, Anna S. Taft retaining the remaining 250 shares. In 1914, Murphy, the president of the club, and owner of 530 shares, seriously involved the welfare of the club by discharging Manager Evers, and in February, 1914, Governor Tener, president of the National League, and other members, met in Cincinnati to settle the controversy. A protracted meeting, lasting all afternoon, was held in Mr. Taft's office, at which Governor Tener, the plaintiff, defendant, Miss Walsh, Mr. Toole of the Boston Base Ball Club, and Mr. Ackerland, who had become the owner of Chance's 100 shares, were present. Mr. Taft was negotiating with Murphy by long distance 'phone for the purchase of 530 shares and finally bought them for $500,000, paying $50,000 cash and giving his note for $450,000 at 5% interest, the 530 shares being pledged as collateral. Murphy was also employed as adviser to the club at a yearly salary of $10,000 for five years, provided Taft owned the controlling stock during said period, and Taft also authorized Murphy to dispose of 780 shares at $800 per share and agreed to pay him, as commission, one-half of whatever was realized above that sum, and the other shareholders were given the privilege of selling on the same terms. Between 1914 and 1916, Taft made several unsuccessful attempts to sell the club. Schmalstig knew of these efforts and assisted him in some of them, and prepared certain statements and plans showing the financial results of such prospective sales.

After 1913 the earnings of the club fell off considerably and the formation of the new Federal League with a club in Chicago reduced the dividends to 5% in 1915. In November, 1915, Taft offered to sell to one Weeghman 900 shares of the club, the 530 Murphy shares, 250 Anna S. Taft shares, 100 Schmalstig shares and 20 Mary Walsh shares for $500,000. Nothing was done at that time. On January 3, 1916, Taft returned to his office from

the South and according to the plaintiff, the following conversation took place between them:

"Direct Examination of Plaintiff, Rec., 15 *et seq.*:
* * * "I approached him on the subject by asking him. 'Mr. Taft, what is there about this base ball deal' * * * and he said 'Oh yes, on November 3d, I negotiated for the sale of 900 shares for $500,000.' And I said to him, 'Then I would receive $55,555 for my 100 shares.' He turned quickly, by saying, 'No, I won't, I might divide between Miss Walsh and you,' meaning me. * * * 'I might divide $50,000 between Miss Walsh and yourself,' meaning me. * * * Says I, 'I regard my stock as worth $75,000 * * * and that I expected my one-ninth portion of $500,000. * * * And I said to him, 'You say you only want to pay $50,000 by dividing between Miss Walsh and me.' And he gave me no answer the second time as he did the first when I told him I expected my whole ninth part of that money, and he didn't reply to it, he didn't reply to it the second time when I spoke then and I answered he had my way of thinking that I was entitled to my one-ninth part of that money. I didn't offer my stock that evening * * * but on the next morning I said I would go into the deal of the sale of the 900 shares for $500,000, and Mr. Taft said 'You can depend on me, and I will do the right thing,' and I assumed it was all right."

The plaintiff then stated in detail how he delivered his stock to Mr. Taft, what he did in Chicago in closing up the deal, and how he paid his proportion of the amount due the purchaser, and then said:

"I then made a demand of Mr. Taft for this $55,555, and he turned around to me, 'I want your resignation.' Well, I was stunned for the moment, and I says, 'Mr. Taft you already have my resignation.' And he says, 'Is that so?' And I got up and told him, says I, 'Now I am going after my money.' "

On cross-examination, this vesion was adhered to. See records, pages 106, 107.

" 'You want to divide up the $50,000 between us, between Miss Walsh and me?' I wanted to test him to see whether he still had that in mind, of reducing that portion that belonged to me of that one-ninth part, but he did not say anything to that, and I assumed that he was going to do the right thing by me."

Miss Walsh gives the following version of what took place between Mr. Schmalstig and Mr. Taft. She said they were both angry and she heard Mr. Taft say, "I will give you what I please." On page 13 of her testimony, she says:

"Mr. Schmalstig, Mr. Taft and myself were in Mr. Taft's private office, and he told me to be seated, and Mr. Taft said, 'Now with regard to that stock' and before he had got any further, Mr. Schmalstig said, 'I will give you my stock, Mr. Taft. I will give it to you cheerfully,' and Mr. Taft said, 'That is all I want to know.' He said, 'I think you can trust me to treat you fairly,' and I believe they both shook hands."

She then tells of Mr. Schmalstig's trip to Chicago to close the Weeghman deal, and his return, and of $13,000 check Mr. Taft gave him and his refusal to accept it.

Miss Cutter testified (Record, page 33):

That Schmalstig and Taft had a very heated argument and that she heard Mr. Taft say to Schmalstig, "I tell you I won't. I will give you what I please." And that during the following week Schmalstig was figuring dividing up $50,000 at 37%, and that one day he showed her how he would lose $42,000 by the deal, and when she asked him how he figured that, he said that $13,000 was 37% of $50,000 and deducting that from $55,000 showed a loss of $42,000, and that he made the remark, "Mr. Taft might as well go down to the bank and take it out of his bank account as to take it that way."

At page 42 of Mr. Taft's testimony, his version of what took place between Mr. Schmalstig and himself is given:

"I told him that I expected Mr. Sinclair here on the 5th to negotiate for the purchase of the Cubs and the price talked of was $500,000, and that I would want his stock to make up the 90%. 'Well,' said he, 'how much am I to be paid.' I said, 'You will get your ten thirty-sevenths, just as was agreed on before. Mrs. Taft will get twenty-five thirty-sevenths and Miss Walsh two thirty-sevenths after paying the Murphy note. He said that wouldn't suit him. Then he talked, he said he wanted —I don't—I can not quite remember what per cent., it was a per cent. that he had been claiming, amounting to I think $55,000. 'Well,' I said, 'You will never get that.' Then he went on to talk about the $47,000 after it was remitted to me, and he wanted to know if I wouldn't divide that up between him and Miss Walsh and I said I would not. * * * The aggregate amount

I was going to divide among them was $50,000. The fact is I was going to pay all the interest on the Murphy note and give Mr. Schmalstig $13,000, which was 10% of the $50,000, Mrs. Taft would get her twenty-five thirty-sevenths and Miss Walsh get two thirty-sevenths without charging them any interest whatever. * * * The next day I called him in and asked him what he was going to do. 'Why,' he said, he would turn the stock over to me. He was very pleasant, says he would do whatever I wanted. * * * I believe he shook hands on that. We had made it all up. That was the impression I had and I relied upon him; he said I could have the stock.' After Schmalstig's return from Chicago, Mr. Taft offered him the $13,000 check, and Mr. Taft says he would not take that check, that he wanted $55,000. 'That is the first time I heard about the $55,-000 when he made that demand.' Says I, 'Mr. Schmalstig, I will take your resignation.'"

The plaintiff contended that when Mr. Taft received his 100 shares and used them to complete the sale to Weeghman that Mr. Taft was, in law, obligated to pay only his one-ninth share of the price, amounting to $55,555.55. The defendant denied any liability for money had and received and in his answer set forth the whole history of the transaction, contending that in the purchase of the Murphy stock he was acting as the plaintiff's agent and that as such he was entitled on re-sale with the plaintiff's consent, first to reimburse himself for the Murphy purchase, and also that the plaintiff had agreed that he should repay himself for the money advanced for the Murphy stock. The plaintiff in his reply denied both the agency and any agreement for reimbursement.

Upon the foregoing state of facts and the pleadings, is the verdict for the plaintiff against the weight of the evidence?

In order to answer this question, I have carefully read the transcript of the evidence furnished me by both counsel, and in this opinion I have quoted at length from the evidence of the plaintiff and of the defendant. Placing the broadest construction possible upon the plaintiff's evidence and dismissing for the present all the evidence offered by the defendant, there is no doubt whatsoever that Mr. Taft positively refused to accept Mr. Schmalstigs stock with the understanding that he was to pay him one-ninth of the purchase price. Throughout his testimony

the plaintiff says he assumed that Mr. Taft would do the right thing.

"I did not offer my stock that evening * * * but on the next morning I said I would go into the deal of the sale of the 900 shares for $500,000 and Mr. Taft said, 'You can depend on me, and I will do the right thing,' and I assumed it was all right."

And this conviction is strengthened by the reading of the evidence of Miss Walsh and Mr. Taft. According to Miss Walsh, Mr. Schmalstig said:

" 'I will give you my stock, Mr. Taft, I will give it to you cheerfully,' and Mr. Taft said, 'That is all I want to know. I think you can trust me to treat you fairly.' "

Mr. Taft testified:

"The next day I called him in and asked him what he wished to do. 'Why,' he said, he would turn the stock over to me. He was very pleasant; says he would do whatever I wanted."

But it is earnestly contended by counsel for the plaintiff that the finding of the jury should not be disturbed merely because the court might differ with them. As a general rule, the trial court should not set aside a verdict of the jury where the evidence is conflicting and where different minds could come to different conclusions, but in cases where the jury disregard the law as given them by the court and reach conclusions not substantiated by the undisputed facts of the case, a court should not hesitate to set aside a verdict. That duty, disagreeable as it is, becomes the less so in the instant case for the reason that three members of the jury refused to sign the verdict. In the general charge the court instructed the jury:

"If Mr. Schmalstig told Mr. Taft that if he disposed of that one hundred shares of stock, he would look to Mr. Taft for one-ninth of the proceeds, or fifty-five thousand five hundred and fifty-five dollars and fifty-five cents, and nothing else was said about the matter, and Mr. Taft took that stock, then Mr. Taft would be liable if Mr. Schmalstig told him * * * for that amount.

"If, however, Mr. Taft distinctly refused to accept that one hundred shares of stock upon the assumption of one-ninth of the ·

liability to the plaintiff, for that one hundred shares of stock, then, if that was the understanding between the parties, at that time, and if upon the next day Mr. Schmalstig handed Mr. Taft this one hundred shares of stock, after Mr. Taft had said to Mr. Schmalstig, 'I will not do that, I will do something else;' or if he said to Mr. Schmalstig, 'I will pay you only your proportionate share of this amount,' or 'I will pay you a proportionate share of the fifty thousand dollars, which has been received in dividends'—then, when Mr. Schmalstig, on the next day, delivered this one hundred shares of stock to Mr. Taft, if nothing else took place between the parties, then Mr. Taft would only be liable for that proportionate share of the amount in accordance with the agreement.''

If, therefore, the jury disbelieved the witnesses for the defendants, nevertheless, under the above charge of the court, giving the broadest construction, as I have already said, to the plaintiff's testimony alone, the verdict is contrary to the law as laid down by the court and for that reason should be set aside.

I am also of the opinion that there was a prejudicial error in the giving of the first special instruction requested by the plaintiff, regarding the burden of proof on the question of agency. That instruction reads:

''The jury is instructed that the defendant must show by the burden of proof by a preponderance or weight of the evidence that he bought from Murphy five hundred and thirty shares as agent for the plaintiff, to the extent of the plaintiff's proportion as claimed by the defendant.''

It is well settled in this state that a wrong instruction as to burden of proof is reversible error. In *McNutt* v. *Kauffman*, 26 O. S., page 127, which was an action where the plaintiff sued for money had and received, the defendant answered, admitting that they had received from the plaintiff the sum sought to be recovered, but said that this sum was paid to them in advance upon a contract, which contract they were willing to perform according to its terms, but which they said the plaintiff had broken. The plaintiff, by reply, denied the allegations contained in the answer, and on the trial, the court instructed the jury that the burden of proof was upon the defendant to prove

that the plaintiff had committed a breach of the contract. This was held error.

To the same effect are the rulings of the Supreme Court in the case of *List & Son* v. *Chase,* 80 O. S., p. 42.

In that case the Supreme Court laid down the rule that where a plaintiff sets forth in his petition a contract with the defendant, and avers that he has performed all of the conditions on his part, and the defendant for answer denies the allegations of the petition and alleges a contract differing in material conditions from that alleged by the plaintiff, the burden remains with the plaintiff to prove the contract and his performance as alleged in his petition; and it is error for the court to charge the jury that as to the claim made in the defendant's answer the burden is on the defendant, and that the contract as alleged in the answer and denied in the reply must be made by a preponderance of the evidence. See also, *Newman Mfg. Co.* v. *Fisler,* 81 O. S., 499.

The plaintiff contends, however, that the cases cited by the defendant are cases of express contract, while the case at bar is for money had and received, and cites to support this contention the case of *Sanns* v. *Neal,* 52 O. S., 56.

That was an action on a quantum meruit for work and labor performed. The defendant filed his answer in which he set up a general denial, and as a second defense he said that the services rendered by the plaintiff were performed by virtue of special contracts; that the wages and compensation under the special contracts amounted to $3,101.33 and that these were the services referred to by the plaintiff in his petition; that during the employment and service, the defendants paid to the plaintiff the sum of $3,194.40. The defendants further say that they overpaid the plaintiff, and that therefore there was nothing due him on account of the pretended services. The trial judge instructed the jury that the burden of proof was upon the defendants to show that the services set out in the petition were rendered under a special contract as to the price to be paid therefor.

The Supreme Court held that this charge was correct, and in its opinion stated that the general denial of the defendants

puts in issue every fact necessary to establish in the plaintiff a right of recovery for any sum whatever. But that as the evidence was not disputed that the plaintiff was in the employ of the defendants for the period that he claimed,

"The great controversy, aside from the statute of limitations, is as to whether the services were rendered under an implied contract, by which the plaintiff is entitled to recover its reasonable value, or on an express agreement as a certain sum per month, as alleged in the answer. Now, as the service is by the evidence of the defendants substantially admitted, so far as the time is concerned, before the defendants can limit the amount of recovery by the special agreement alleged, its existence must be established by a preponderance of the evidence. As to that, the burden of proof is upon the defendants."

This case was distinguished by the Supreme Court in the case of *Dykeman* v. *Johnson,* 83 O. S., 126, p. 135.

The Dykeman case was an action upon an account. The defendant in his answer, in addition to pleading the general denial, alleged that the services performed by the plaintiff were rendered and performed by him under an express contract the terms of which precluded the recovery of compensation therefor, and the court held that such averments did not constitute an affirmative defense of new matter requiring a reply, and that the filing of a reply thereto does not operate to change or enlarge the issues, or to shift the burden of proof. That the legal effect of such an answer, taken as a whole, is merely to deny the cause of action asserted by the plaintiff in his petition, and that the burden of proof upon the issues thus joined rested with the plaintiff, and that the trial court correctly charged the jury to that effect.

In speaking of the case of *Sanns* v. *Neal,* 52 O. S., 56, the court said:

"While certain of the language found in the majority opinion in that case is seemingly perhaps, at first glance, opposed to the conclusion reached by us in this case, yet, when the facts of that case are fully considered, we very much doubt if the court thereby intended to decide anything which we are called upon to overrule or reverse in the present case. In that case, which was also an action on account for services rendered, the

defendants in their answer, after pleading the general denial, by way of further and particular defense alleged that all of the services performed by plaintiff were performed by him under a special contract, and that full payment therefor according to the terms of said contract had been made to the plaintiff, and, while the rendition of the services sued for was put in issue by the general denial, performance of such services by the plaintiff and that he was entitled to compensation therefor was not in dispute, but on the trial was admitted by the evidence of defendants themselves. The performance of the services being admitted, this averment of special contract and plea of payment under and pursuant thereto was more than a mere denial; it was in legal effect the assertion of an affirmative defense, the burden of maintaining which was on the defendants. These facts we think so far differentiate and distinguish that case from the case at bar as to leave it without controlling effect in the determination of the present case.''

This statement of the Supreme Court in the Dykeman case readily distinguishes the *Sanns* v. *Neal* case from the case at bar. The defense of agency was not an affirmative defense. It was merely setting out an agreement different from the agreement that the plaintiff claimed was the true statement of the transaction between the parties. It is elementary that if a defense is an affirmative defense that the defendant has the burden of proving such a defense, but a careful reading of the answer shows conclusively that it merely was a specific denial of the claim of the plaintiff. This view is strengthened by the fact that upon the filing of the answer the plaintiff filed his motion to strike out all the allegations showing the relationship between the parties on the ground that it was pleading evidence.

I do not think that there was any error prejudicial to the defendant in the giving of the other special charges to which exception was taken. For the above reasons that the verdict is manifestly against the weight of the evidence and for the error in the giving of the special charge regarding the burden of proof on the question of agency, the verdict of the jury must be set aside and a new trial granted.